## Frederick Leefers v. The People, ex rel. Etta Leefers.

1. Conservator—*what test of propriety of appointing.* The test in determining whether a conservator should be appointed for an alleged distracted person is whether such person was and is of such mental soundness and capacity as to enable him intelligently to transact the ordinary business and affairs of life.

Petition for appointment of conservator. Appeal from the Circuit Court of Macoupin County; the Hon. R. B. Shirley, Judge, presiding. Heard in this court at the May term, 1905. Reversed, with finding of fact. Opinion filed February 1, 1906.

W. E. P. Anderson and Rinaker & Rinaker, for appellant.

Bell & Burton and E. C. Knotts, for appellee.

Mr. Justice Baume delivered the opinion of the court.

May 23, 1904, Etta Leefers, a daughter of appellant, filed her petition in the County Court of Macoupin County, alleging, in substance, that appellant was mentally distracted and feeble-minded, and by reason of unsoundness of mind, he had lately, without any good or valuable consideration, conveyed all his farm lands, worth several thousand dollars, to certain of his children, and was rapidly wasting his estate; that he was unfit to properly manage and control his property and was incapable of managing and caring for his own estate, and praying for the appointment of a conservator. Upon the trial in the County Court the jury returned a verdict finding appellant to be a distracted person, who, by reason of unsoundness of mind, was incapable of managing and caring for his own estate, and thereupon the court appointed a conservator according to the prayer of the petition. Appellant prayed an appeal to the Circuit Court, where upon a trial by a jury a like verdict was returned and judgment entered thereon, and he now prosecutes his appeal to this court.

Appellant was born in Germany in 1842, and has lived

in Macoupin county for more than forty years. He had been an active farmer all his life, until 1897, when he moved to Carlinville, where he built a house and has since continued to reside. Prior to the conveyances hereinafter mentioned, appellant was the owner of 522 acres of farm land in Macoupin county. Many years ago he acquired, partly by inheritance from his father, and partly by purchase from his brother, 102 acres of land known as the Home farm. About 1879 he purchased 260 acres known as the Anderson farm, and about 1891 he purchased 160 acres, known as the McIntyre farm. He is the father of eleven children, ten of whom, four sons and six daughters, still survive. His wife died in 1893, and he has never remarried. The evidence strongly tends to show, and the jury were warranted in so finding, that as each of his daughters, save one, arrived at an age of from twelve to fourteen years, appellant took grossly improper liberties with their person and solicited and sought to have sexual intercourse with them, and that he consummated his purpose in that regard with one of his daughters; that all of his daughters, through fear that he might succeed in gratifying his beastly lust, and to escape his importunities to that end, left his home as opportunity offered, some upon their marriage, and others to seek employment or a home elsewhere.

On May 16, 1904, one week following the departure from his home of his three younger daughters, appellant conveyed by warranty deeds to his four sons all his farm lands, reserving the rents for 1904, as follows: To Albert, 130 acres for $6,500; to John, 160 acres for $7,750; to Frank, 102.48 acres for $4,500; and to Louis, a minor, 130 acres, for $4,650, reserving a vendor's lien for the purchase money to be paid March 1, 1905. No cash payment was made to appellant by the sons, but each of the adult sons gave his unsecured promissory notes for the purchase price, as follows: Albert, one note for $2,000 payable one year after date, without interest, two notes each for $2,000 and one note for $500, payable respectively in two, three and four years after date with interest at four per cent. per

annum; John, one note for $2,000, payable one year after date, without interest, two notes, each for $2,000, and one note for $1,750, payable respectively in two, three and four years after date, with interest at four per cent. per annum; Frank, one note for $2,000, payable one year after date, without interest, one note for $2,000 and one for $500, payable respectively in two and three years after date, each bearing interest at the rate of four per cent. per annum. Immediately following the execution and delivery of the said deeds by appellant to his sons, and the execution and delivery by the said adult sons of their said notes to appellant, appellant gave to each adult son the note for $2,000 payable one year after date, without interest, executed by such adult son, and then declared his intention to give Louis, his minor son, credit for a like amount upon his arriving at the age of twenty-one years. Appellant, himself, determined the scheme of dividing his land into four farms, fixed the price and terms of payment for each tract, and negotiated the sale to his sons in accordance therewith. The evidence is conflicting as to the market value of the lands, witnesses on behalf of appellee fixing it at from $33,600 to $40,000, and witnesses on behalf of appellant fixing it at from $24,700 to $28,800. If evidence of recent sales of land in the vicinity is given due weight, the value fixed by the witnesses on behalf of appellant more nearly approximates the actual market value of the land involved. The aggregate selling price of the land is $23,400, and we are clearly of opinion that the amount is not so much less than the actual value, as to justify the conclusion that appellant was overreached, or that he was incapable of appreciating the value of his property and exercising ordinary sound judgment in its disposition.

A large number of witnesses, farmers, merchants, bankers and physicians, who have known appellant for many years and have seen him frequently, testify that he is a first class farmer, capable and careful in his business transactions, and in their opinion is of sound mind and fully capable of managing and caring for his own estate, and no witness on behalf of appellee testifies to the contrary.

If appellant was of sound mind and memory at the time he conveyed his farm lands to his sons and gave to his adult sons their several notes for $2,000, he but did what he had a clear right to do, and his so doing is not at all inconsistent with his soundness of mind or his ability to manage and care for his own estate. Appellant retains a vendor's lien for $4,650 upon the land sold to his minor son, and the latter has appellant's promise to remit to him $2,000 of the selling price as a gift, when he arrives at the age of twenty-one years. Appellant also holds notes of his adult sons for $15,400, drawing interest at four per cent. per annum. True, the notes are not secured by mortgage on the property sold, but the makers are sons of appellant, and as the evidence tends to show, are thrifty farmers who have accumulated personal property and money. Appellant owns his own home in Carlinville, and the interest on the unpaid purchase money for his farm land is sufficient to enable him to live comfortably according to his condition in life.

The verdict of the jury is predicated solely upon the evidence of appellant's conduct toward his daughters and the transactions attending the sale of his land to his sons. Language is wholly inadequate to fitly characterize the conduct of appellant toward his daughters, and yet his conduct in that regard is not enough, under the evidence in this record, to justify a court and jury in finding that he is incapable of managing and caring for his own estate.

In this proceeding under section 1 of chapter 86, appellant's capability of managing and caring for his own estate is the vital issue, and before a jury would be justified in finding him to be a distracted person within the meaning of said section, they must believe from the evidence that he is so far incapable of acting rationally in the ordinary affairs of life, and of comprehending the nature and value of his property, as to be incapable of transacting ordinary business.

In this case, we are impelled to the conclusion that the evidence does not warrant a jury in so finding.

In Snyder v. Snyder, 142 Ill. 60, very pertinently to the issue in the case at bar, it is said: "There are numerous legal proceedings where insanity or mental incapacity may be shown, and the rule for establishing the degree of insanity must of necessity vary, depending, as it must, upon the object or purpose for which the insanity is to be proved. In one case the purpose may be to prove insanity as a defense to a criminal charge. In another case the purpose may be to defeat the execution of a will. In another case the question may be whether the person shall be deprived of his liberty and confined in an asylum, and still in another case the question may be whether a conservator shall be appointed to take charge of the estate of the insane person. What might be regarded insanity or mental incapacity in the one case would not necessarily be insanity in another. No definite rule can be laid down which will apply to all cases alike."

Without undertaking to determine here what proof would be necessary to establish insanity or unsoundness of mind in the different cases named, it is manifest, on an application like the one in question, the true question is whether the person has sufficient mental capacity to transact ordinary business,—to take care of and manage his or her own property. Our statute on the subject seems to indicate that such is the proper test. Section 37, of chapter 86, provides: "Where a person for whom a conservator has been appointed shall be restored to his reason, such person may apply to the County Court to have the conservator removed and the care and management of his property restored to him." Section 39 declares it shall be the duty of the court to which such application is made, to cause a jury to be summoned "to try the question whether said applicant is a fit person to have the care, custody and control of his or her property, and if the jury return in their verdict that such person is a fit person to have the control of such property, as aforesaid," then the court shall enter an order restoring such person to his former rights and privileges.

Under this last section the legislature has expressly de-

clared that ability to manage and control property is the test whether the person has been restored to reason. The inquiry under the first section of the act is to ascertain whether the mind of the person is so far impaired that a conservator should be appointed, while under section 39 the inquiry is whether the conservator should be continued. Why should one test of mental capacity be required in the one case and a different test be applied in the other case? If, as the legislature has declared, on the trial of the question whether the conservator should be continued, the true test to determine the mental condition is whether such person is a fit person to have charge of his affairs, and thus capable of transacting ordinary business, no reason is perceived why the same rule should not be applied where a petition has been filed under section 1 of the statute.

The judgment is reversed with a finding of fact to be incorporated in the judgment of this court.

*Reversed, with finding of fact.*

Finding of fact: We find that appellant is not a distracted person incapable of managing and caring for his own estate.